

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 22-2583

KURT BEATHARD,

                                                        *Plaintiff-Appellee,*

                                   *v.*

LARRY LYONS and BROCK SPACK,

                                                     *Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:21-cv-01352-JES-JEH — **James E. Shadid**, *Judge.*

_____

ARGUED APRIL 9, 2024 — DECIDED FEBRUARY 27, 2025

_____

Before EASTERBROOK, ROVNER, and JACKSON-AKIWUMI, *Circuit Judges*.

ROVNER, *Circuit Judge*. In this section 1983 action, plaintiff Kurt Beathard alleges that he was discharged from his position as a university football coach at Illinois State University ("ISU") as a result of personal speech, protected by the First Amendment, that he had posted on the door to his office. *See* 42 U.S.C. § 1983. The defendants contend that they are entitled to dismissal of the complaint pursuant to Fed. R. Civ. P.

1:21-cv-01352-MMM    # 46    Filed: 03/21/25    Page 2 of 18
Case: 22-2583    Document: 00714534424    Filed: 03/21/2025    Pages: 16    (2 of 18)

2                                                                  No. 22-2583

12(b)(6) on the ground of qualified immunity, because it would not have been clear to them in the Fall of 2020 that Beathard's speech was protected as personal rather than official speech, *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), nor would it have been clear that they could not discharge Beathard based on the disruption his speech fomented among team players, *Pickering v. Bd. of Educ. of Tp. High Sch. Dist. 205*, 391 U.S. 563 (1968). Because the district court concluded that factual development was in order before it could resolve the question of qualified immunity, *see Beathard v. Lyons*, 620 F. Supp. 3d 775, 783–84 (C.D. Ill. 2022), we dismiss the appeal for want of appellate jurisdiction.

## I.

The following facts are derived from Beathard's amended complaint (hereinafter, the "complaint"), the allegations of which we accept as true at this stage of the case. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 195 (2024).

Beathard was engaged as the offensive coordinator for the Illinois State University football team in July 2020. Beathard had a 25-year history of coaching, and indeed he had worked as offensive coordinator for ISU in 2014, 2015, 2018, and 2019. Beathard's previous engagements with ISU were successful: his breaks in service were occasioned not by ISU's dissatisfaction with his performance, but rather his late wife's illness. When Beathard returned to ISU in 2020, defendant Larry Lyons was the Athletic Director and Brock Spack was the head football coach.

In the late Summer and early Fall of 2020, there was tension and unrest on the ISU campus related to the death of

No.22-2583 3

George Floyd,[1] and some of the players on the football team were threatening to boycott team practice, resulting in the cancellation of several practice sessions. In August, the athletic department had posters printed in support of the Black Lives Matter movement. The posters featured photographs of ISU student athletes and included the hashtag, "#BlackLivesMatter."



R. 13 at 5 ¶ 20. Several football coaches placed the poster on their own office doors, and an unknown person placed the poster on Beathard's door as well.

---

[1] Floyd, a black man, was asphyxiated by a white Minneapolis police officer in May 2020 while he was being arrested on suspicion of passing a counterfeit $20 bill. Cell-phone video recordings of his death sparked protests across the country in the ensuing weeks and months.

4  No. 22-2583

Beathard removed the poster from his office door and replaced it with a handwritten message stating, "All Lives Matter to Our Lord & Savior Jesus Christ."



R. 13 at 6 ¶ 22. The message was on his office door for approximately two weeks. Although, due to the Covid-19 pandemic, students were not allowed into the area of the coaches' offices at that time, Beathard alleges that another coach who hoped to replace him as offensive coordinator photographed Beathard's message and shared it with team players. According to the complaint, "some" football players "apparently" found the message offensive and threatened to continue boycotting practice sessions. R. 13 at 9 ¶¶ 33–34.

The complaint represents that there is no university or athletics department policy regarding what employees may post on their office doors. Faculty and staff at ISU, as at other universities, commonly decorate their office doors with posters,

No.22-2583 5

cartoons, articles, and so forth that reflect their personal views and beliefs.

However, ISU does have a written anti-harassment and non-discrimination policy which provides in relevant part that "[e]ach member of the University community enjoys the right to free speech. The right of free expression and the open exchange of ideas stimulates debate, promotes creativity, and is essential to a rich learning environment. … As members of the University Community, students … and staff have a responsibility to respect others and show tolerance for opinions that differ from their own … ." R. 13 at 10 ¶ 41.

Meanwhile, athletic director Lyons placed himself into difficulty during a Zoom address to ISU student athletes regarding the boycott problem when he said, "All [ISU] Redbird Lives Matter." R. 13 at 7 ¶ 25. That only fanned the flames of discontent, and Lyons announced his retirement the following month.

On or about August 29, head football coach Spack came to Beathard's office and asked him to remove the handwritten "All Lives Matter" message from his office door. Beathard complied. Days later, on September 1, following the cancellation of a team practice session, Spack told Beathard that he was in trouble because of that message. R. 13 at 9 ¶ 34.

On the following morning, September 2, Spack called Beathard into his office and advised him that he was being terminated from his position as offensive coordinator because Spack didn't "like the direction of the offense." R. 13 at 9 ¶ 35. Beathard alleges that this explanation was "100% pretext," because Spack had previously complimented Beathard's work. R. 13 at 9 ¶ 35. Moreover, the team had not yet played a single

6                                                                   No. 22-2583

game that year (nor, as it turned out, would it play at all in the 2020 season, due to the Covid-19 pandemic). Spack informed Beathard that Lyons was involved in this decision and would be in touch with him about a future assignment. Eventually, Beathard was assigned to researching other university teams' Covid-19 practices, which he characterizes as a make-work task. (In the meantime, two other coaches had replaced him as offensive coordinator.) When his contract expired at the end of 2020, it was not renewed, ending his employment with the university.

Beathard filed this suit pursuant to section 1983 alleging that he was improperly terminated as offensive coordinator due to the exercise of his free speech rights. He contends that the message he posted on his office door was personal speech on a matter of public concern rather than official speech associated with his job responsibilities, and that as such, it was protected by the First Amendment. Yet, he alleges, because the defendants saw his message as being inconsistent with the athletic department's support of the Black Lives Matter movement, the defendants discharged him.[2]

Lyons and Spack filed a motion to dismiss the complaint pursuant to Rule 12(b)(6), arguing that the complaint did not set forth a viable First Amendment claim and also that they are entitled to qualified immunity, because it would not have been clear to them in the Fall of 2020 that a message posted on Beathard's office door was properly understood as personal speech rather than official, government speech *or* that the

---

[2] Beathard named as a third defendant Kyle Brennan, who succeeded Lyons as ISU's athletic director. Brennan was named only in his official capacity, however, and he is not a party to this appeal.

No.22-2583 7

university could not discipline Beathard for the speech based on the disruption it caused among members of the football team.

Judge Shadid denied the motion without resolving the defendants' invocation of qualified immunity. 620 F. Supp. 3d 775. In the first instance, he concluded that the complaint made out a viable claim that Beathard had been discharged based on the exercise of his free speech rights. Relying in part on the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 597 U.S. 507, 529–30 (2022), which held that a high school football coach's prayer on the playing field immediately after team football games was private rather than official speech, the judge concluded that Beathard's actions in posting the handwritten message on his office door were not taken in furtherance of his official job duties. *See Garcetti*, 547 U.S. at 421. "[Beathard] was expressing his personal views, which in no way owed their existence to his responsibilities as a public employee. Plaintiff was not paid by the University to decorate his door or to use it to promote a particular viewpoint, he was employed to coach football." 620 F. Supp. 3d at 782 (cleaned up). And under ISU's own anti-harassment and non-discrimination policy, Beathard had the right to express his personal viewpoint, within reason. *Id.* The judge went on to find that Beathard had adequately alleged that his speech was a motivating factor in his discharge. *Id.* at 782–83. Finally, the judge noted that although under *Pickering*, 391 U.S. at 568, a teacher's right to comment on matters of public concern must be balanced against the State's interest in the efficiency of the public services it provides through its employees, this is a highly fact-specific weighing that must occur on a developed record. *Id.* at 783 (citing *Gustafson v. Jones*, 290 F.3d 895,

1:21-cv-01352-MMM    # 46    Filed: 03/21/25    Page 8 of 18
Case: 22-2583    Document: 00714534424    Filed: 03/21/2025    Pages: 16    (8 of 18)

8                                                                          No. 22-2583

909 (7th Cir. 2022)). The court found it premature to engage in the *Pickering* analysis at the pleading stage of the case. *Id.*

As to qualified immunity, Judge Shadid observed that "[i]t is often not advisable … to consider qualified immunity at the pleadings stage." *Id.* Therefore, without saying anything further on the subject of qualified immunity, the Judge concluded by stating, "Defendant's Motion to Dismiss is denied … with respect to the issue of qualified immunity, with leave to reassert on a more fully developed record." *Id.* at 784.

## II.

Interlocutory orders, including denials of a motion to dismiss, ordinarily are not immediately appealable. *See Lauro Lines, s.r.l. v. Chasser*, 490 U.S. 495, 498 (1989). With limited exceptions, the rule is that all claims of error must be raised in a single appeal following the entry of final judgment. 28 U.S.C. § 1291; *see Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981).

Orders denying qualified immunity are one such exception to this rule. *Lauro Lines*, 490 U.S. at 500 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "[A]n order rejecting the defense of qualified immunity at *either* the dismissal stage *or* the summary judgment stage is a 'final' judgment subject to immediate appeal." *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996) (emphasis in original); *McGee v. Parsano*, 55 F.4th 563, 570 (7th Cir. 2022); *Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020) (citing *Mitchell*, 472 U.S. at 530). Allowing review of such orders is consistent with the goal of sparing a public official from the burden of defending a suit and standing trial when the right he is accused of violating was not clearly established at the time he acted. *See Pearson v. Callahan*, 555 U.S. 223, 231–

No.22-2583 9

32 (2009); *Behrens*, 516 U.S. at 305–06; *Mitchell*, 472 U.S. at 525–26.

By contrast, an order postponing a decision on qualified immunity ordinarily is not appealable. *Khorrami v. Rolince*, 539 F.3d 782 (7th Cir. 2008).

> Unless the district court delays so long in ruling that the delay becomes a *de facto* denial, a decision not to rule on a motion [to dismiss on grounds of qualified immunity] is just that: inaction. This follows from the general rule the Supreme Court has acknowledged forbidding interlocutory appeals in situations where "unresolved issues of fact" remain or the district court has not even "tentatively decided anything about the merits of the claim."…

*Id.* at 786 (quoting *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 25 (1966)) (additional citations omitted).

The defendants suggest that our decision in *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 667 (7th Cir. 2012), cabined *Khorrami* and allowed appeals of orders postponing decisions on qualified immunity in addition to those denying qualified immunity. We do not read *Abelesz* that way.

*Abelesz* involved a question of sovereign immunity: the plaintiffs were suing Hungarian state entities and instrumentalities (Hungary's central bank and national railway) for the theft of property from Jewish families during the Holocaust. When, at the pleading stage of the case, the defendants sought dismissal of the complaints based on their immunity from suit under the Foreign Sovereign Immunities Act, 28 U.S.C.

1:21-cv-01352-MMM    # 46    Filed: 03/21/25    Page 10 of 18
Case: 22-2583    Document: 00714534424    Filed: 03/21/2025    Pages: 16    (10 of 18)

10                                                              No. 22-2583

§ 1604, the district court concluded that the plaintiffs had alleged enough to invoke an expropriation exception to FSIA immunity, *id.* § 1605(a)(3), and on that basis denied the defendants' motions to dismiss. *See Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, 807 F. Supp. 2d 689, 697 (N.D. Ill. 2011) ("Plaintiffs allege that Magyar took money and other property held in bank accounts or kept in safe deposit boxes at Magyar. [S]uch taking was in violation of international law. … Finally, plaintiffs have sufficiently alleged that Magyar owns or operates the property in question and that Magyar is engaged in commercial activity in the United States within the meaning of the FSIA.") (citations omitted), *vacated & remanded by Abelesz*, 692 F.3d 661; *Victims of the Hungarian Holocaust v. Hungarian State Rys.*, 798 F. Supp. 2d 934, 938 (N.D. Ill. 2011) ("Plaintiffs have … alleged facts that, when accepted as true at the motion to dismiss stage, suggest that Plaintiffs' personal property, contractual rights, and interest in real property were taken by [Hungarian State Railways] and that the takings violated international law. … Plaintiffs have [also] alleged facts showing that HSR conducts commercial activity in this case sufficient to satisfy the nexus requirement for the takings exception."), *vacated & remanded by Abelesz*. To the extent that the defendants denied the relevant factual allegations, the court added that it was premature to resolve the veracity of the complaint's factual allegations on a motion to dismiss, and that the defendants were free to reassert their immunity defenses on summary judgment. *Magyar Nemzeti Bank*, 807 F. Supp. 2d at 697; *Hungarian State Rwys.*, 798 F. Supp. 2d at 938.

When the defendants appealed these rulings in *Abelesz*, we determined that we had jurisdiction over the appeal precisely because the district court had denied the motions to dismiss,

and we distinguished *Khorrami* on that basis, noting that in *Khorrami*, the district court had postponed a decision on the question of immunity. 692 F.3d at 668. Although the district court's decisions in *Abelesz* had also included language indicating that it was "premature" to resolve the merits of the sovereign immunity defense, which was "not ripe for adjudication" at the pleading stage of the case, we were satisfied that the district court—having otherwise found the complaints' allegations sufficient to invoke an exception to sovereign immunity—had, in fact, denied the motions to dismiss on the merits, resulting in a ruling that was subject to interlocutory review. *Id.* (More on the *Abelesz* district court's "premature" and "not ripe for adjudication" language in a moment.)

The same cannot be said here. To be sure, the district court in this case did say at the conclusion of its order that the defendants' motion to dismiss was "denied." R. 13 at 10. But the court's language in the preceding sentence makes clear that the court did not think it advisable to address qualified immunity with only the allegations of Beathard's complaint to inform its assessment. By way of explanation, the court cited *Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019), and *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000), for the common-sense point that qualified immunity is fact-driven, and yet as a matter of federal pleading rules the plaintiff is not required to set out in his complaint all of the facts that might bear on qualified immunity. The court's reference here to "a more fully developed record" in its concluding sentence thus leaves no doubt that it did not believe this was a case in which the defense could be evaluated based on the face of the complaint, but rather that further development was necessary before it could properly assess qualified

1:21-cv-01352-MMM     # 46     Filed: 03/21/25     Page 12 of 18
Case: 22-2583     Document: 00714534424     Filed: 03/21/2025     Pages: 16     (12 of 18)

12                                                                No. 22-2583

immunity. *Beathard*, 620 F. Supp. 3d at 784; *see Hanson*, 967 F.3d at 591–92. Nowhere in its order did the court otherwise suggest that Beathard had either pleaded enough to overcome qualified immunity or had instead pleaded himself out of court by making allegations that left no doubt that the defendants were entitled to qualified immunity. In short, the court's order "d[id] not settle or even tentatively decide anything" about the merits of the defendants' qualified-immunity arguments. *Switzerland Cheese Ass'n*, 385 U.S. at 25. It reserved those arguments for a later date.

By contrast, the district court in *Abelesz* had reached the merits of the immunity defense, reasoning that the plaintiffs had alleged enough in their complaints to support FSIA's expropriation exception to sovereign immunity. When the *Abelesz* court added that it was "premature" to resolve the "merits" of the sovereign immunity defense, it was merely recognizing that allegations and facts are not the same thing, and that the evidence subsequently adduced in discovery might show that one or more of the complaint's material allegations as to the FSIA's expropriation exception were not true, and the court's qualified-immunity inquiry might, as a result, produce a different conclusion. *Magyar Nemzeti Bank*, 807 F. Supp. 2d at 697; *Hungarian State Rwys.*, 798 F. Supp. 2d at 938; *see Hanson*, 967 F.3d at 591–92. This is why an immunity defense can be raised at multiple stages of the case: At the pleading stage, the assessment of qualified immunity turns solely on the allegations of the complaint, whereas at the summary judgment stage, the assessment turns on the undisputed facts. *Behrens*, 516 U.S. at 309. Thus, if a court has rejected qualified immunity at the former stage of the case, the defense can be raised again at the latter stage. *Id.* at 307–08.

No.22-2583 13

Here, there can be no doubt that the district court was postponing consideration of the qualified immunity defense, bringing this case within the rubric of *Khorrami* rather than *Abelesz.* Indeed, the balance of the court's order confirms the court's conclusion that factual development was required before the court could reach the merits of the immunity defense.

As we have noted, the defendants, apart from invoking qualified immunity, had also moved to dismiss Beathard's First Amendment claim on the ground that his allegations failed to state a claim on which relief might be granted. The district court rejected this argument in part: It found that Beathard engaged in protected personal speech when he affixed the "All Lives Matter" poster to his office door. 620 F. Supp. 3d at 782. But more is required to establish that one's state employer violated its employee's First Amendment rights by taking disciplinary action against him based on his personal speech. His speech must have addressed a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 145–47 (1983), and under *Pickering*, 391 U.S. at 568, a plaintiff must also show that his interest in speaking on such a matter outweighed his public employer's interest in the efficiency of the public services it performs through its employees. As to this aspect of Beathard's First Amendment claim, the court said that without discovery and development of the facts, it could only conduct the *Pickering* balance by engaging in speculation. 620 F. Supp. 3d at 783.

The district court's conclusion as to *Pickering* was not at all unreasonable: the *Pickering* balance is inherently fact-dependent. *See Lalowski v. City of Des Plaines*, 789 F.3d 784, 791 (7th Cir. 2015); *McGreal v. Ostrov*, 368 F.3d 657, 675 (7th Cir. 2004); *Gustafson*, 290 F.3d at 909 (all noting the fact-specific

nature of the *Pickering* balancing test). As such, it is precisely the sort of matter that typically cannot be resolved on the pleadings. *See McGreal*, 368 F.3d at 677 ("*Pickering* balancing is not an exercise in judicial speculation.") (quoting *Gustufson*, 290 F.3d at 909).

The district court's rationale as to *Pickering* further illustrates why the court thought it necessary to postpone a decision on qualified immunity. Although we have acknowledged that qualified immunity can be resolved on pleadings in certain situations, *Sabo v. Erickson*, No. 21-3332, --- F.4th ---, 2025 WL 354484, at *3 (7th Cir. Jan. 31, 2025) (en banc) (collecting cases), particularly when the relevant issues are legal or "abstract," *Hanson*, 967 F.3d at 590, we have recognized that it will often be premature to do so at the motion to dismiss stage. *E.g.*, *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022); *Hanson*, 967 F.3d at 589–90. Especially where the merits of a plaintiff's claim turn on the application of a fact-intensive balancing test, it will be difficult to assess prior to discovery whether the results of that test would have been obvious to the defendant without knowing "what is being balanced against what." *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J. concurring).

The defendants emphasize that Beathard's complaint itself acknowledges that the message posted on his office door caused dissention among the ranks of the school's football players. *Pickering* recognizes that a public employer may discipline an employee for personal speech that interferes with its mission. 391 U.S. at 568. As the defendants see it, the disruption that Beathard's speech fomented among team members gave Lyons and Spack all the cause they needed to remove Beathard from his position—or enough cause, at least,

1:21-cv-01352-MMM    # 46   Filed: 03/21/25   Page 15 of 18
Case: 22-2583   Document: 00714534424   Filed: 03/21/2025   Pages: 16   (15 of 18)

No.22-2583                                                            15

to be shielded by qualified immunity for the discharge. In fact, however, the complaint alleges only that "some" football players "apparently" were "upset" by Beathard's message and threatened to continue boycotting practice sessions, and that Coach Spack later advised Beathard he was "in trouble" because of that message. R. 13 at 9 ¶¶ 33–34. Beathard himself disputes the notion that his speech resulted in substantial disruption among the team's players. R. 13 at 12 ¶ 47. The complaint tells us nothing concrete about the impact that Beathard's message had on team players and how that factored into the university officials' decision to remove him as offensive coordinator. Second- and third-hand accounts about the effects of a plaintiff's speech are a shaky foundation for a *Pickering* inquiry. For that matter, the complaint alleges that Spack told Beathard he was being removed for an altogether different reason (because Spack was unhappy with the direction of the offense). R. 13 at 9 ¶ 35. In these circumstances, it was reasonable for the district court to conclude that it required more information about the defendants' rationale for terminating Beathard before assessing whether the discharge decision was consistent with *Pickering* and, if not, whether that would have been clear to the defendants when they removed Beathard as offensive coordinator.

We take the defendants' point that qualified immunity is meant to spare a defendant the burden of litigation, not merely an adverse monetary judgment at the conclusion of a suit. *See Pearson*, 555 U.S. at 231, 237 (citing *Mitchell*, 472 U.S. at 526). To that end, an invocation of qualified immunity should be resolved as soon as the record allows an assessment of the defense. *Sabo*, 2025 WL 354484, at *3. But at what stage of the case it is realistically possible to evaluate qualified immunity depends on the nature of the claim and circumstances

16    No. 22-2583

of the individual case. In some cases, the fact-intensive nature of the claim means that resolution of a qualified immunity defense must await factual development. *E.g.*, *Roldan*, 52 F.4th at 339. The district court reasonably understood this to be such a case.

This is not to say that deferring the question of qualified immunity leaves the defendants with no protection from the burdens of litigation. The district court has broad discretion to manage discovery (including the imposition of appropriate limits) and to prioritize development of the record as to the issues relevant to the defense of qualified immunity. *See Jacobs v. City of Chicago*, 215 F.3d 758, 775–76 (7th Cir. 2000) (Easterbrook, J., concurring). The district court and the parties may also prioritize a motion for summary judgment focused on qualified immunity without prejudice to a later round of summary judgment focused on other issues. *Roldan*, 52 F.4th at 340.

### III.

Because the district court postponed a decision on the defendant's invocation of qualified immunity rather than denying their motion to dismiss on that basis, we lack jurisdiction over this appeal.

DISMISSED.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

February 27, 2025

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

*Before*

FRANK H. EASTERBROOK, *Circuit Judge*
ILANA DIAMOND ROVNER, *Circuit Judge*
CANDACE JACKSON-AKIWUMI, *Circuit Judge*

| No. 22-2583 | KURT BEATHARD,<br>　　　　Plaintiff - Appellee<br><br>v.<br><br>LARRY LYONS and BROCK SPACK,<br>　　　　Defendants - Appellants |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:21-cv-01352-JES-JEH<br>Central District of Illinois<br>District Judge James E. Shadid ||

　　We **DISMISS** the appeal, with costs, for want of appellate jurisdiction, in accordance with the decision of this court entered on this date.

*[signature]*

Clerk of Court

form name: **c7_FinalJudgment**　　(form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

March 21, 2025

To:  Shig Yasunaga
     UNITED STATES DISTRICT COURT
     Central District of Illinois
     Peoria, IL 61602-0000

| | |
|---|---|
| No. 22-2583 | KURT BEATHARD,<br>　　　　Plaintiff - Appellee<br><br>v.<br><br>LARRY LYONS and BROCK SPACK,<br>　　　　Defendants - Appellants |
| **Originating Case Information:** ||
| District Court No: 1:21-cv-01352-JES-JEH<br>Central District of Illinois<br>District Judge James E. Shadid ||

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                            No record to be returned

form name: **c7_Mandate**    (form ID: **135**)